1
2
3
4
5
6
7
8                  UNITED STATES DISTRICT COURT
9                  CENTRAL DISTRICT OF CALIFORNIA
10
11
12  JEROME I. DOUGLAS,                )    Case No. CV 13-7782-VBF (KK)
                                      )
13           Plaintiff,               )
                                      )    MEMORANDUM AND ORDER
14       v.                           )
                                      )
15  CAROLYN W. COLVIN, Acting         )
    Commissioner of Social Security,  )
16                                    )
             Defendant.               )
17  _____ )

18       Plaintiff Jerome I. Douglas seeks review of the final decision of the Commissioner

19  of the Social Security Administration ("Commissioner" or "Agency") denying his

20  application for Title II Disability Insurance Benefits ("DIB").  The parties have

21  consented to the jurisdiction of the undersigned United States Magistrate Judge, pursuant

22  to 28 U.S.C. § 636(c).  For the reasons stated below, the Commissioner's decision is

23  REVERSED and this action is REMANDED for further proceedings consistent with this

24  Order.

25
26
27
28
                                      1

I.

**PROCEDURAL HISTORY**

On December 2, 2010, Plaintiff filed an application for DIB.[1]  Administrative Record ("AR") at 56.  On June 27, 2011, the Agency denied the application.  Id. at 70. On September 1, 2011, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  Id. at 75.  On March 21, 2012, a hearing was held before ALJ James L. Moser. Id. at 39-53.  On April 25, 2012, the ALJ issued a decision denying Plaintiff's application.  Id. at 33.  On May 4, 2012, Plaintiff asked the Agency's Appeals Council to review the ALJ's decision.  Id. at 17.  On September 12, 2013, the Appeals Council denied Plaintiff's request for review.  Id. at 1.

On October 23, 2013, Plaintiff filed the instant action.  This matter is before the Court on the parties' Joint Stipulation ("JS"), filed July 15, 2014, which the Court has taken under submission without oral argument.

II.

**RELEVANT FACTUAL BACKGROUND**

Plaintiff was born on October 17, 1949, and his alleged disability onset date is April 1, 2008.  AR at 124.  He was 58 years old at the time of the onset date, and 62 years old at the time of the hearing before the ALJ.  Plaintiff graduated from high school. See id. at 141.  In his Disability Report, Plaintiff claimed he worked as a sales representative from January 2000 until April 2008.  Id.  However, at the hearing before the ALJ, Plaintiff said he was "incarcerated for a long period of time," and was not released until 2003.  Id. at 43.  Plaintiff said he then sold, delivered, and stocked food in stores.  Id. at 50.  Plaintiff alleges disability based upon his advanced age, right arm pain

---

[1] Plaintiff previously applied for DIB on May 29, 2009.  That application was denied on September 3, 2009, and is not under review in this action.  See Administrative Record ("AR") at 22 ("This prior denial is administratively final and there is no good cause to reopen.").

2

caused by a gunshot wound, depression, anxiety, chronic hepatitis, and cardiac condition.  Id. at 40.

**A.      Opinion of Treating Psychotherapist**

From February 2, 2011, through June 27, 2011, Plaintiff went to New Beginnings Human Services, Inc. ("NBHS"), in Los Angeles, for psychotherapy.  See id. at 439-42. One of Plaintiff's psychotherapists at NBHS was Dr. Maurice Zeilin.[2]  See id. The handwritten notes of Plaintiff's psychotherapy sessions contain the following information:

-      Plaintiff had been in prison for 15 years, and had a history of using drugs and alcohol.  Id. at 442.

-      Plaintiff had been shot in the back in 1981 during an attempted robbery, and is now 65 percent disabled in his right arm.  Id.

-      On February 9, 2011, Plaintiff complained of "financial strain, sleeping disorder, constant pain, [and] headaches," along with "nightmares due to [the loss] of [his] wife" and "the big gap that his imprisonment has caused in his life."  Id.  Plaintiff expressed that his life was "a mess."  Id.

-      At almost every weekly session from February 9, 2011, until May 17, 2011, Plaintiff complained he was stressed and had difficulty sleeping.  See id. at 440-42.

-      On February 23, 2011, Plaintiff complained he was dizzy and felt like he was falling when he stood up.  Id. at 442.

-      On June 2, 2011, Plaintiff was depressed because his mother was in the hospital, and cried during the entire session.  Id. at 440.  At the final session

---

[2] Judging from the handwritten psychotherapy notes, Dr. Zeilin was not the only psychotherapist whom Plaintiff saw at NBHS.  For certain psychotherapy sessions, the notes contain different handwriting and a different signature than Dr. Zeilin's.  See AR at 439-42.

1    on June 27, 2011, Plaintiff continued to feel depressed about his mother's

2    health. Id. at 456.

3        On January 17, 2012, Plaintiff was informed that his services at NBHS were

4    terminated. Id. at 454. He was referred to other outpatient mental health clinics in Los

5    Angeles. Id.

6        In forms dated March 6, 2012, and March 7, 2012, Dr. Zeilin stated he had contact

7    with Plaintiff on a bi-monthly basis.[3] Id. at 461. He said Plaintiff had been prescribed

8    Seroquel and Xanax,[4] which caused Plaintiff to experience dizziness and drowsiness. Id.

9    Under a section for "clinical findings," Dr. Zeilin wrote that Plaintiff suffered from

10   major depression and schizophrenia, and that his prognosis was "fair." Id. (Dr. Zeilin

11   also wrote the word "Bipolar," but crossed it out. Id.) Dr. Zeilin recorded a current

12   Global Assessment of Functioning (GAF) score of 45, and a peak GAF score of 50 in the

13   previous year.[5] Id.

14

15   [3] It is unclear when Dr. Zeilin began seeing Plaintiff on a bi-monthly basis.

16
17   [4] Seroquel, a brand name for quetiapine, is "used to treat the symptoms of
     schizophrenia" and depression. Quetiapine: MedlinePlus Drug Information, National
18   Institutes of Health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html
     (last visited Sept. 21, 2014). Xanax, a brand name for alprazolam, is "used to treat
19   anxiety disorders and panic disorder." Alprazolam: MedlinePlus Drug Information,
20   National Institutes of Health,
     http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html (last visited Sept. 21,
21   2014).

22
23   [5] "A GAF score is a rough estimate of an individual's psychological, social, and
     occupational functioning used to reflect the individual's need for treatment." Garrison v.
24   Colvin, 759 F.3d 995, 1002 n.4 (9th Cir. 2014) (citation and internal quotation marks
     omitted). It only takes into account impairment in functioning due to mental illness, not
25   impairment "due to physical (or environmental) limitations." American Psychiatric
26   Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") at 34
     (4th ed. 2000 (Text Revision)). A GAF score between 41 and 50 indicates "[s]erious
27   symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR
28   any serious impairment in social, occupational, or school functioning (e.g., few friends,

4

1    Using a checklist, Dr. Zeilin identified various "signs and symptoms" in Plaintiff,

2    including but not limited to:  anhedonia, appetite disturbance, decreased energy, blunt

3    affect, feelings of guilt or worthlessness, generalized persistent anxiety, difficulty

4    thinking or concentrating, persistent disturbances of mood or affect, psychomotor

5    agitation, paranoid thinking, emotional withdrawal, memory impairment, sleep

6    disturbance, recurrent severe panic attacks, and bipolar syndrome.  Id. at 462.

7    Using another checklist, Dr. Zeilin found that, in 25 of 25 "mental abilities and

8    aptitudes" needed to do unskilled, semiskilled, or skilled work, Plaintiff was in the

9    second most limited category of "unable to meet competitive standards."[6]  Id. at 463-64.

10   Those mental abilities and aptitudes included but were not limited to:  remembering

11   work-like procedures; understanding, remembering, and carrying out very short and

12   simple instructions; maintaining attention for a two-hour segment; maintaining regular

13   attendance and punctuality; completing a normal workday and workweek without

14   interruptions from psychologically based symptoms; getting along with co-workers or

15   peers; dealing with normal work stress; understanding, remembering, and carrying out

16   detailed instructions; using public transportation; and adhering to basic standards of

17   neatness and cleanliness.  Id.

18   Dr. Zeilin wrote that Plaintiff cannot stay focused and circled "Yes" when asked

19   whether Plaintiff had "reduced intellectual functioning."  Id. at 464.  Dr. Zeilin circled

20   "No" when asked whether Plaintiff's "psychiatric condition exacerbate[s] [his]

21   experience of pain or any other physical symptom."  Id.  Using yet another checklist, Dr.

22

23   conflicts with peers or co-workers)."  Id.

24

25   [6] The categories of limitation, from least to most limited, were (1) "unlimited or very
     good," (2) "limited but satisfactory," (3) "seriously limited, but not precluded," (4)
26   "unable to meet competitive standards," and (5) "no useful ability to function."  AR at
     463.  According to the form, "unable to meet competitive standards" means the "patient
27   cannot satisfactorily perform this activity independently, appropriately, effectively, and
     on a sustained basis in a regular work setting."  Id.
28

5

1    Zeilin stated that Plaintiff had an "anxiety related disorder and complete inability to

2    function independently outside the area of [his] home." Id. at 465.  Using a "Yes/No"

3    questionnaire, Dr. Zeilin stated that Plaintiff is not "a malingerer"; his impairments or

4    treatment would cause him to be absent from work more than four days per month; his

5    impairment has lasted or can be expected to last at least twelve months; and his alcohol

6    or substance abuse does not contribute to any of his limitations.  Id. at 466.  Finally, Dr.

7    Zeilin stated that Plaintiff would be able to "manage benefits" in his own best interest.

8    Id.

9

10   **B.    Plaintiff's Pre-Hearing Allegations**

11        In an Exertion Questionnaire dated February 7, 2011, Plaintiff stated:  "Because of

12   my back pain[,] which is constant[,] I am always depressed and not able to work any

13   more." Id. at 167.  He said he lives in a house with his family, on whom he depends

14   "daily." Id.  Plaintiff said he can lift only small objects; cannot climb stairs; can walk

15   only short distances; drives only when necessary because sitting is painful; does not

16   sleep because his pain "will not let me"; takes Motrin and Vicodin; and "can't

17   concentrate" because he is "always depressed." Id. at 168-69.

18        In a Pain Questionnaire dated May 31, 2011, Plaintiff said he began experiencing

19   sharp back pain in 2009.  Id. at 170.  He also said he is able to stand for only five

20   minutes at a time, and is able to sit for only ten to fifteen minutes at a time.  Id. at 172.

21        In an undated Function Report, Plaintiff said his pain and depression "will not

22   allow me to sleep"; he does not need reminders to take his medicine, or to take care of

23   personal needs or grooming; he is not able to prepare meals; he does not take care of

24   anyone; he is able to pay bills, handle a savings account, count change, and use a

25   checkbook; he needs someone to drive him places because he has trouble sitting and his

26   concentration is poor; and he cannot handle any type of stress because he is depressed.

27   Id. at 159-166.

28

6

**C.      Consultative Examination (Physical)**

On April 14, 2011, Plaintiff received a consultative exam by Dr. Soheila Benrazavi, at the request of California's Department of Social Services. Id. at 403. In a summary report, Dr. Benrazavi stated that Plaintiff complained of hepatitis C, back pain, chest pain, and left shoulder pain. Id. at 407. According to the summary report, Plaintiff showed "signs of moderate chronic liver disease," but no signs of decompensation. Id. The report further stated that Plaintiff's "right shoulder range of motion is diminished." Id. In a section titled "Functional Assessment," Dr. Benrazavi wrote that Plaintiff was able to lift and carry twenty pounds occasionally and ten pounds frequently; to sit, stand, and walk up to six hours in an eight-hour workday; but could only occasionally work "above the head in the right upper extremity." Id.

**D.      Consultative Examination (Psychiatric)**

On April 16, 2011, Plaintiff received a complete psychiatric evaluation by Dr. Fahmy Ibrahim, at the request of California's Department of Social Services. Id. at 411. According to Dr. Ibrahim, Plaintiff arrived unaccompanied by bus; walked in without the assistance of a walking device; was "casually dressed and well groomed"; had normal posture; and was "engaged and cooperative" during the evaluation. Id. Plaintiff said he cannot focus at work because he "feels fatigued and dizzy." Id. at 412. He said he has "been depressed and suffered from anxiety since he was incarcerated for 30 years." Id. Plaintiff admitted he drinks beer occasionally and smokes a pack of cigarettes per day, but denied using drugs. Id. at 412-13. Plaintiff said he had an "excellent" relationship with his family, and was "able to dress, bath[e] himself, clean, run errand[s], do gardening, listen to radio, read the newspaper, exercise[], and study." Id. at 413. Plaintiff also said he was unable to manage his own money. Id.

Dr. Ibrahim found that Plaintiff was well-developed and well-nourished; was able to maintain eye contact during the interview; had fluent, regular speech; had a depressed mood and a restricted affect; had linear thought processes; exhibited no evidence of

1  delusions, paranoia, or suicidal ideation; was able to "register" three of three items, and

2  to recall two of those items five minutes later; was able to do serial seven backwards

3  counting; was able to spell the word "table" backwards; was able to engage in abstract

4  thinking; and had insight and judgment which appeared to be "intact." Id. at 413-14.

5       Dr. Ibrahim diagnosed Plaintiff with adjustment disorder with anxiety and

6  recorded a GAF score of 60.[7] Id. at 414. Under a section titled "Functional

7  Assessment," Dr. Ibrahim found that Plaintiff's ability to relate to and interact with

8  colleagues was mildly limited; his ability to understand and carry out simple instructions

9  was normal; his ability to maintain enough focus to do work-related activities was mildly

10 to moderately limited; his ability to understand and carry out detailed instructions was

11 mildly to moderately limited; and his ability to cope with work-place stress was

12 moderately limited. Id. As his prognosis, Dr. Ibrahim stated:  "From a psychiatric

13 standpoint, there is possibility of improvement after next 12 months of active treatment."

14 Id. at 415.

15

16 **E.    Disability Determination Explanation**

17      On June 27, 2011, a Disability Determination Explanation (DDE) was issued. Id.

18 at 68. In one section of the DDE, Dr. R.E. Brooks, a non-examining doctor, concluded

19 that Plaintiff's affective disorders cause mild restriction of activities of daily living; mild

20 difficulties in maintaining social functioning; mild difficulties in maintaining

21 concentration, persistence or pace; and no episodes of decompensation of extended

22 duration.[8] Id. at 63. The DDE further stated that Plaintiff's "statements about the

23 _____

24      [7] A GAF score of 60 indicates "[m]oderate symptoms (*e.g.*, flat affect and

25 circumstantial speech, occasional panic attacks) OR moderate difficulty in social,
   occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-

26 workers)."  DSM-IV at 34.

27      [8] Dr. Brooks acknowledged that, according to Dr. Ibrahim's examination, Plaintiff

28 "would have moderate limitations handling stress in a work setting and completing a

1    intensity, persistence, and functionally limiting effects" of his symptoms were not

2    "substantiated by the objective medical evidence alone." <u>Id.</u> at 64.  In one portion of the

3    DDE, the following note appears:  "showed no difficulty with [mental status

4    examination].  not seeing a psychiatrist.  non-severe." <u>Id.</u>

5

6    **F.    ALJ Hearing**

7          On March 21, 2012, a hearing was held before ALJ Moser. <u>Id.</u> at 30.  Plaintiff

8    was represented by counsel and testified in person. <u>Id.</u>  Vocational expert Kelly Winn-

9    Boaitey also testified in person, and a medical expert testified by phone. <u>Id.</u>

10

11          **1.    Plaintiff's Testimony**

12         Plaintiff testified he last worked in early 2009 in marketing as a sales

13   representative and also stocking shelves in a grocery store. <u>Id.</u> at 41.  In that job,

14   Plaintiff lifted up to 80 pounds. <u>Id.</u>  Plaintiff said it was now "very hard" for him to get

15   up in the morning, and that he had only "65% motor skills" in his right arm. <u>Id.</u> at 42.

16   Plaintiff said he had back pain and numbness in his fingers because his blood vessels

17   were constricted. <u>Id.</u>  Plaintiff said he received psychiatric treatment once a month at

18   NBHS, which his family helped to pay for, and that he took medication for depression

19   and anxiety. <u>Id.</u> at 42-43.  Plaintiff said he was unable to walk more than a couple of

20   blocks before needing to take a break. <u>Id.</u> at 43.  Plaintiff said he had pain when sitting,

21   and spent "three or four hours" in bed during the day, "[j]ust lying there." <u>Id.</u> at 44.

22   Plaintiff said he cannot lift anything heavy. <u>Id.</u>

23         The ALJ asked Plaintiff whether he worked since he received the gunshot wound

24   in 1981. <u>Id.</u> at 45.  Plaintiff admitted he worked with the wound. <u>Id.</u>  The following

25   exchange then occurred:

26

27   _____

28   normal workweek without interruption."  AR at 63.

9

| | | |
|---|---|---|
| [ALJ:] | [So] you adapted to [the wound]? | |

[ALJ:]     [So] you adapted to [the wound]?

[Plaintiff:]  I adapted to it until the high blood pressure came in and I [fell] off the ladder and I didn't want to fail my job because I needed the job.  And, ever since then, I've had problems with the muscles in my arm, my leg, my back.  I still can't I can only go so far.

[ALJ:]     When you fell off the ladder, did you treat for that problem?  Did you go to a hospital or? [sic]

[Plaintiff:]  What happened was I fell off the ladder and the, what do you call it, the clerks at the store, they set me down.  I [sat] there for a little while.  I got up and drove to the hospital.  I didn't know what else to do.

[ALJ:]     Did you make a Worker's Comp claim?

[Plaintiff:]  No, because I needed the job.

Id. at 45-46.

## 2.  Vocational Expert's Testimony

Vocational expert Kelly Winn-Boaitey testified that, taking into consideration Plaintiff's residual capacity assessment, a hypothetical individual could be a sales representative in food products – at least as the Labor Department's *Dictionary of Occupational Titles* ("DOT") defines that job, under DOT § 260.357-014.  Id. at 50-51.  However, Ms. Winn-Boaitey acknowledged, with Plaintiff's right shoulder limitation, Plaintiff would not be able to do that job as he *actually* performed it, which involved lifting up to 80 pounds.  Id. at 51.

Plaintiff's counsel asked Ms. Winn-Boaitey whether a hypothetical claimant "who was likely to be off task up to two hours of the day due to psychological symptoms and symptoms of pain . . . [would] be able to engage in any competitive employment."  Id. at 52.  Ms. Winn-Boaitey answered, "No."  Id.  Plaintiff's counsel then asked:  "And, what is the maximum number of absences within a given month that is typically tolerated by most employers in your professional opinion?"  Id.  Ms. Winn-Boaitey answered, "In my opinion, no more than one on a regular basis."  Id.

10

1

**III.**

2

**STANDARD FOR EVALUATING DISABILITY**

3        To qualify for DIB, a claimant must demonstrate a medically determinable

4  physical or mental impairment that prevents him from engaging in substantial gainful

5  activity, and that is expected to result in death or to last for a continuous period of at

6  least twelve months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998).  The

7  impairment must render the claimant incapable of performing the work he previously

8  performed and incapable of performing any other substantial gainful employment that

9  exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

10        To decide if a claimant is disabled, and therefore entitled to benefits, an ALJ

11  conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are:

12        (1)    Is the claimant presently engaged in substantial gainful activity?  If so, the

13                claimant is found not disabled.  If not, proceed to step two.

14        (2)    Is the claimant's impairment severe?  If not, the claimant is found not

15                disabled.  If so, proceed to step three.[9]

16        (3)    Does the claimant's impairment meet or equal one of the specific

17                impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the

18                claimant is found disabled.  If not, proceed to step four.[10]

19        _____

20        [9] In evaluating whether a mental impairment is severe, the ALJ must rate the degree
of functional loss resulting from the impairment, in four areas:  (a) activities of daily

21  living; (b) social functioning; (c) concentration, persistence, or pace; and (d) episodes of

22  decompensation.  20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3); see also Maier v.
Comm'r of Soc. Sec. Admin., 154 F.3d 913, 914-15 (9th Cir. 1998).  The Agency's

23  regulations state:  "If we rate the degree of your limitation in the first three functional

24  areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that

25  your impairment(s) is not severe, unless the evidence otherwise indicates that there is

26  more than a minimal limitation in your ability to do basic work activities."  20 C.F.R. §§
404.1520a(d)(1), 416.920a(d)(1).

27        [10] "Between steps three and four, the ALJ must, as an intermediate step, assess the

28  claimant's [residual functional capacity]."  Bray v. Comm'r of Soc. Sec. Admin., 554

11

(4)     Is the claimant capable of performing work he has done in the past?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)     Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. §§ 404.1520(b)-(g)(1), 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  Id. at 954.  If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work experience.  Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

# IV.
# THE ALJ'S DECISION

**A.      Step One**

At step one, the ALJ found that Plaintiff "has not engaged in substantial gainful activity since April 1, 2008, the alleged onset date" of disability.  AR at 24 (citations omitted).

---

F.3d 1219, 1222-23 (9th Cir. 2009) (citing 20 C.F.R. § 416.920(e)).  In determining a claimant's residual functional capacity, an ALJ must consider all relevant evidence in the record.  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).  This involves, inter alia, evaluating the credibility of a claimant's testimony regarding his capabilities.  Chaudhry v. Astrue, 688 F.3d 661, 670 (9th Cir. 2012).

**B.      Step Two**

At step two, the ALJ found that Plaintiff "has the following severe impairment: status post balloon angioplasty and stents placement." Id. (citation omitted).  However, the ALJ found the following impairments non-severe:  hepatitis C, hypertension, "old gunshot wound to the right arm," liver disease, bronchitis, and occasional chest pain. Id. at 24-25.

The ALJ also found that Plaintiff did not have a severe mental impairment.  In making that finding, the ALJ stated:

> The record indicates the claimant received treatment on an intermittent basis for his mental health (Exhibits 7F, 8F, and 10F). The treatment records show the claimant received conservative treatment of prescription medication and counseling (Exhibits 3F-5F, 7F, 8F, and 10F).  There is no evidence to suggest the claimant was ever hospitalized for psychiatric treatment or received any psychotherapy.  In some treatment notes, the claimant reported being forgetful, feeling depressed, or having difficulty sleeping (Exhibits 3F, p. 2; 4F, pp. 93 98, 103; 5F, p. 5; 7F; 8F; and 10F).  On some occasions, the claimant appeared depressed, hostile, or had a blunt affect (id.).  However, the record supports the claimant's mental status was essentially normal throughout the treatment records indicating the claimant was mostly alert and oriented with a good mood and exhibited no obvious psychiatric issues (id.).  Accordingly, the claimant's mental impairment is found nonsevere.
>
> . . .
>
> In determining the claimant has no severe mental impairments, the undersigned has given great weight to the opinion of the State agency

13

1    review physicians who determined the claimant's mental impairments
2    were nonsevere and caused no more than mild difficulty with regards
3    to the [four functional areas] (Exhibit 3A[11]).  Specifically they
4    opined the claimant had mild restriction in activities of daily living;
5    mild difficulties in social functioning; and mild difficulties with
6    regard to concentration, persistence or pace (id.).  They opined the
7    evidence did not support any episodes of [decompensation] of
8    extended duration (id.).  The opinions of these physicians are
9    consistent with the evidence of record, are well supported by the
10   claimant's treatment history, and consistent with the claimant's
11   admitted activities of daily living.  Accordingly, these opinions are
12   given great weight.

13

14   The undersigned gives little weight the opinions of psychiatric
15   consultative examiner, Fahmy Ibrahim, M.D. (Exhibit 6F).  Upon
16   face-to-face examination, Dr. Ibrahim assessed the claimant with Axis
17   I diagnosis of adjustment disorder with anxiety (id.).  Dr. Ibrahim also
18   determined the claimant's global assessment functioning (GAF) score
19   was 60 [footnote omitted] (id.).  Despite the claimant's allegations of
20   disability, Dr. Ibrahim reported the claimant was only noted to be
21   dressed with a constricted affect (id.).  The doctor reported the
22   claimant maintained eye contact and had normal psychomotor
23   activity, fluent speech, linear goal directed thought process, intact
24   insight and judgment, and no exhibited hallucinations, delusion, or
25   illusions (id.).  Based on these findings, Dr. Ibrahim opined the
26   claimant had moderate limitations in his ability to cope with work
27

28   [11] Exhibit 3A is the DDE.

14

place stress and mild to moderate limitation in maintaining focus and concentration require[d] to do work related activities and in his ability to understand and [carry out] detailed instructions (id.).  The opinions of Dr. Ibrahim are inconsistent with the objective and clinical evidence of record supporting the claimant's mental status was essential[ly] normal throughout the record.  Furthermore, his opinions are contradictory to the findings from his own examination of the claimant.  Accordingly, the undersigned has relied more on the opinions of the State agency review physicians' psychological assessments in making the determination state herein as their opinions are more consistent with the record as a [whole].

The undersigned has read and gives little weight to the disability statements on a check-box forms [sic] by Dr. Maurice Zeilin, dated March 6 and 7, 2012 (Exhibits 12F and 13F).  The limitations assessed by Dr. Zeilin would essentially preclude the claimant from substantial gainful activity (id.).  The undersigned has given little weight to this opinion because it is brief, conclusory, and inadequately supported by clinical findings.  This opinion of Dr. Zeilin appears to place more weight on the claimant's subjective complaints that have been found only partially credible.  Dr. Zeilin's opinions are contradictory to the claimant's treatment history and even his own assessments of the claimant's mental status.  Additionally, the evidence of record supports the claimant's mental status was essentially normal.  Furthermore, as an opinion on an issue reserved to the Commissioner, this statement is not entitled to controlling weight and is not given special significance pursuant to 20 CFR 404.1527(e) and SSR 96-5.  Accordingly, the undersigned

15

1              finds Zeilin's opinions had little probative value because they were

2              inconsistent with the objective medical evidence as a whole and

3              claimant's admitted activities of daily living that have already been

4              described above in this decision.

5    Id. at 25-27.

6

7    **C.    Step Three**

8         The ALJ found that Plaintiff did not meet or equal any of the impairments listed in

9    20 C.F.R. Part 404, Subpart P, Appendix 1.  Id. at 27.

10

11   **D.    RFC Determination**

12        The ALJ found that Plaintiff "has the residual functional capacity to perform light

13   work as defined in 20 C.F.R. 404.1567(b) and SSR 83-10 except for the following

14   limitations:  the claimant is limited to performing postural activities on an occasional

15   basis."[12]  Id. at 28.  The ALJ stated that he had reviewed "the entire record," id., and

16   "considered the functional limitations resulting from all of the claimant's medically

17   determinable impairments, including those that are nonsevere."  Id. at 27 (citation

18   omitted).  The ALJ explicitly considered testimony and medical findings regarding

19   Plaintiff's "right arm impairments," gunshot wound, hand numbness, back pain,

20   hypertension, psychiatric impairments, chest pain, hepatitis C, and liver function.  See id.

21   at 28-30.

22        Regarding medical opinions that Plaintiff's right shoulder range of motion was

23   diminished, the ALJ stated:

24              In determining the claimant's residual functional capacity, the

25              undersigned has given some but not significant weight to the opinions

26

27           [12] Postural activities include climbing stairs, balancing, stooping, kneeling, and

28   crouching.  Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008).

of the internal medicine consultative examiner, Dr. Benrazavi, and the State agency physical medical consultants on initial review and on reconsideration (Exhibits 3A, 2F, and 5F). The opinions of all of these physicians are generally consistent in that they all assessed the claimant is able to perform a restrictive range of light work with only some differences in the degree of specific function-by-function limitations. The opinion of these physicians indicating the claimant was limited to performing a light range of work is consistent with the evidence of record and given significant weight; however, the specific limitations opined by these physicians are given little weight to the extent they are inconsistent with the determinations herein. The additional restrictions opined by these physicians are inconsistent with the record as a whole and are not supported by the claimant's admitted activities of daily living or the objective and diagnostic evidence of record as discussed above.

Id. at 31.

**E.     Step Four**

At step four, the ALJ found Plaintiff was "capable of performing past relevant work as a sales representative, food products." Id. at 32. The ALJ explained:

[T]he undersigned finds the claimant's work in the occupations listed below is past relevant work . . . :

1.     Sales representative, food products, DOT 260.357-014, is a light, semi-skilled . . . position, as generally performed pursuant to the DOT . . .

. . . .

17

1

. . .

2

3       The undersigned notes that even if the claimant were limited to light

4       work with occasional postural [activities] and no overhead reaching

5       as suggested by the consultative examiner (Exhibit 5F) the vocational

6       expert testified the claimant would still be able to perform his past

7       relevant work as a sales representative, food products as generally

8       performed.  A finding of "not disabled" is therefore appropriate under

9       the framework of this rule.

10 Id. at 33.

11

12 **F.**    **Step Five**

13       The ALJ did not analyze step five.

14

15                         **V.**

16          **PLAINTIFF'S CLAIMS**

17 Plaintiff makes the following arguments:

18    1.    Substantial evidence does not support "[t]he ALJ's finding that there was no

19       severe mental impairment."  JS at 3.  Specifically, that finding is erroneous

20       because the ALJ gave "little weight" to the opinions of Dr. Zeilin and Dr.

21       Ibrahim, while giving the "most weight" to a nonexamining physician.  Id.

22       at 4.

23    2.    In assessing Plaintiff's RFC, the ALJ erred by failing to consider the effect

24       of Plaintiff's "additional impairments," including his "hepatitis C,

25       hypertension, gunshot wound, liver disease, bronchitis, chest pain, and

26       depression."  Id. at 4.

27    3.    In assessing Plaintiff's RFC, the ALJ erred by not crediting Dr. Benrazavi's

28       finding that Plaintiff has a "diminished range of motion in the right

18

1    shoulder." Id. at 10-11.

2    4.    At step four, the ALJ improperly classified Plaintiff's former job as a sales

3          representative as "light work," without "exploring the amount of time"

4          Plaintiff actually spent in that job doing light tasks, as opposed to doing

5          more difficult tasks. Id. at 13-14.

6

7                                      **VI.**

8                          **STANDARD OF REVIEW**

9          Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's

10   decision to deny benefits. This Court "may set aside a denial of benefits if it is not

11   supported by substantial evidence or it is based on legal error." Pinto v. Massanari, 249

12   F.3d 840, 844 (9th Cir. 2001) (citation and internal quotation marks omitted).

13         "Substantial evidence" is evidence that a reasonable person might accept as

14   adequate to support a conclusion. Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir.

15   2007). It is more than a scintilla but less than a preponderance. Id. To determine

16   whether substantial evidence supports a finding, the reviewing court "must review the

17   administrative record as a whole, weighing both the evidence that supports and the

18   evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157

19   F.3d 715, 720 (9th Cir. 1998); see also Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir.

20   2012) (stating that a reviewing court "may not affirm simply by isolating a specific

21   quantum of supporting evidence") (citations and internal quotation marks omitted). "If

22   the evidence can reasonably support either affirming or reversing," the reviewing court

23   "may not substitute its judgment" for that of the Commissioner. Reddick, 157 F.3d at

24   720-21; see also Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when the

25   evidence is susceptible to more than one rational interpretation, we must uphold the

26   ALJ's findings if they are supported by inferences reasonably drawn from the record.").

27         The Court may review only the reasons stated by the ALJ in his decision "and may

28   not affirm the ALJ on a ground upon which he did not rely." Orn v. Astrue, 495 F.3d

                                      19

1   625, 630 (9th Cir. 2007).  If the ALJ erred, the error may only be considered harmless if

2   it is "clear from the record" that the error was "inconsequential to the ultimate

3   nondisability determination."  Robbins, 466 F.3d at 885 (citation and internal quotation

4   marks omitted).

5

6                                              **VII.**

7                                      **DISCUSSION**

8   **A.    The ALJ Erred at Step Two By Prioritizing a Nonexamining Physician's**

9          **Opinion Over the Treating and Examining Physicians' Opinions.**

10         Dr. Zeilin, the treating doctor, and Dr. Ibrahim, the examining doctor, agreed that

11  Plaintiff suffered from a mental impairment.  Dr. Zeilin concluded Plaintiff suffered from

12  depression and schizophrenia, whereas Dr. Ibrahim concluded Plaintiff suffered from

13  adjustment disorder with anxiety.  AR at 414, 461.  Both doctors also found that, as a

14  result of the mental impairment, Plaintiff would have at least some moderate limitations

15  in handling work responsibilities.  See id. at 414, 461-66.  In finding that Plaintiff did

16  not have a severe mental impairment at step two, the ALJ gave "little weight" to their

17  opinions, and instead gave "great weight" to the opinion of Dr. Brooks, who completed

18  the DDE based on a review of Plaintiff's file, rather than on observations of the Plaintiff.

19  Id. at 25-26.  Plaintiff argues the ALJ "applied a 'reverse hierarchy' of weight to the

20  physician opinion evidence."  JS at 4.

21

22         **1.    Legal Standard at Step Two**

23         "At step two, the ALJ assesses whether the claimant has a medically severe

24  impairment or combination of impairments that significantly limits his ability to do basic

25  work activities."  Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (citing 20 C.F.R.

26  § 404.1520(a)(4)(ii)).  "The 'ability to do basic work activities' is defined as 'the abilities

27  and aptitudes necessary to do most jobs.'"  Id. (citation omitted).  These abilities and

28  aptitudes include:  (1) physical functions such as walking, standing, sitting, lifting, and

                                              20

1   carrying; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying

2   out, and remembering simple instructions; (4) use of judgment; (5) responding

3   appropriately to supervision, co-workers, and usual work situations; and (6) dealing with

4   changes in a routine work setting.  Averbach v. Astrue, 731 F. Supp. 2d 977, 981 (C.D.

5   Cal. 2010) (citing, inter alia, 20 C.F.R. §§ 404.1521(b), 416.921(b)).

6        "An impairment or combination of impairments may be found not severe only if

7   the evidence establishes a slight abnormality that has no more than a minimal effect on

8   an individual's ability to work."  Webb, 433 F.3d at 686 (emphasis in original; citations

9   and internal quotation marks omitted).  If "an adjudicator is unable to determine clearly

10  the effect of an impairment or combination of impairments on the individual's ability to

11  do basic work activities, the sequential evaluation should not end with the not severe

12  evaluation step."  Id. at 687 (citation and internal quotation marks omitted).  "Step two,

13  then, is a de minimis screening device [used] to dispose of groundless claims, and an

14  ALJ may find that a claimant lacks a medically severe impairment or combination of

15  impairments only when his conclusion is clearly established by medical evidence."  Id.

16  (citations and internal quotation marks omitted).  "Thus, applying our normal standard of

17  review to the requirements of step two, we must determine whether the ALJ had

18  substantial evidence to find that the medical evidence clearly established that [Plaintiff]

19  did not have a medically severe impairment or combination of impairments."  Id.

20

21        **2.    Legal Standard for Resolving Conflicts in Medical Opinion**

22        An ALJ "must consider all medical opinion evidence," and is responsible for

23  "resolving conflicts in medical testimony."  Tommasetti v. Astrue, 533 F.3d 1035, 1041

24  (9th Cir. 2008); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  "Cases in this

25  circuit distinguish among the opinions of three types of physicians:  (1) those who treat

26  the claimant (treating physicians); (2) those who examine but do not treat the claimant

27  (examining physicians); and (3) those who neither examine nor treat the claimant

28  (nonexamining physicians)."  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995)

(footnote omitted).  Generally, the opinion of a treating physician is entitled to greater weight than the opinion of an examining physician, and the opinion of an examining physician is entitled to greater weight than the opinion of a nonexamining physician.  Id.

Where a treating or examining doctor's opinion is not contradicted by another doctor, "it may be rejected only for clear and convincing reasons supported by substantial evidence in the record." Orn, 495 F.3d at 632 (citation and internal quotation marks omitted).  However, where a treating or examining doctor's opinion is contradicted, the ALJ may reject the opinion if he provides "specific and legitimate reasons supported by substantial evidence in the record." Id. (citations and internal quotation marks omitted).  "This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. (citation and internal quotation marks omitted).  "An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible." Tommasetti, 533 F.3d at 1041 (citations omitted).

"The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." Lester, 81 F.3d at 831 (citations and emphasis omitted).  The Ninth Circuit has, "in some cases, upheld the Commissioner's decision to reject the opinion of a treating or examining physician, based in part on the testimony of a nonexamining medical advisor." Id. (citations omitted).  In those cases, however, there has generally been "an abundance of evidence that supported the ALJ's decision" to prioritize the nonexamining physician's testimony.  Id.  For example, in Magallanes v. Bowen, 881 F.2d 747 (9th Cir. 1989), the ALJ's prioritization of the nonexamining physician's opinion was justified because the examining physicians issued "contrary reports," and because the ALJ was able to rely on laboratory test results and "testimony from the claimant that conflicted with her treating physician's opinion." Lester, 81 F.3d at 831 (citing Magallanes, 881 F.2d at 751-52).  As another example, in Andrews v. Shalala, the

22

1   ALJ's prioritization of the nonexamining physician's opinion was justified because

2   "there was a clear conflict between the examining [doctor's] opinion and the

3   overwhelming weight of the other evidence of record." Id. (citing Andrews, 53 F.3d at

4   1039).

5

6           **3.    Application**

7           There was neither abundant nor overwhelming evidence to support the ALJ's

8   decision to prioritize the findings of Dr. Brooks over the findings of Dr. Zeilin and Dr.

9   Ibrahim.  Under step two's *de minimis* screening standard, the ALJ should have given the

10  benefit of the doubt to Dr. Zeilin's and Dr. Ibrahim's opinion that Plaintiff has a mental

11  impairment which causes greater-than-mild functional limitations.  As the record

12  currently stands, the evidence did not "clearly establish[]" that Dr. Zeilin's and Dr.

13  Ibrahim's opinions were wrong, or that Plaintiff had only a "slight abnormality [with] no

14  more than a minimal effect on [his] ability to work." Webb, 433 F.3d at 686-87.  On the

15  contrary, the record contains psychotherapy notes, along with Dr. Zeilin's statement that

16  Plaintiff has been prescribed Seroquel and Xanax.[13]  See AR at 461.  In addition, the

17  highest GAF score Plaintiff received from either Dr. Zeilin or Dr. Ibrahim was "60,

18  which suggests a mental impairment that is severe in nature." Jimenez v. Astrue, 641 F.

19  Supp. 2d 954, 960 (C.D. Cal. 2009) (citations, internal quotation marks, and ellipsis

20  omitted); see also AR at 414, 461.

21          For these reasons, Plaintiff satisfied the *de minimis* screening standard at step two.

22  See Webb, 433 F.3d at 688 ("There is not, in this instance, the *total absence of objective*

23  *evidence* of severe medical impairment such as was the case in Ukolov v. Barnhart, 420

24  F.3d 1002 (9th Cir. 2005), where we affirmed a finding of no disability at step two when

25  _____

26      [13] In his step two analysis, the ALJ stated:  "There is no evidence to suggest the
    claimant . . . received any psychotherapy." AR at 25.  That statement is incorrect; the
27  record contains at least five pages of psychotherapy notes from NBHS. Id. at 439-42,
28  456.

1   even the claimant's doctor was hesitant to conclude that any of the claimant's symptoms
2   and complaints were medically legitimate.") (emphasis added; citation omitted).  The
3   sequential evaluation concerning mental impairment should not have ended at step two.
4   Remand is appropriate for the ALJ to determine what limitations, if any, are actually
5   posed by Plaintiff's mental impairment, and whether any such limitations affect the
6   remaining steps of the sequential evaluation.

7

8   **B.     In Assessing Plaintiff's RFC, the ALJ Properly Considered Most of Plaintiff's**
9          **Additional Impairments.**

10          Plaintiff argues that the following impairments "should have been contemplated in
11   the context of plaintiff's residual functional capacity":  "plaintiff's hepatitis C,
12   hyptertension, gunshot wound, liver disease, bronchitis, chest pain, and depression."  JS
13   at 4.

14          In assessing Plaintiff's RFC, the ALJ explicitly considered all of those
15   impairments.  AR at 28-30.  To the extent the ALJ erred at step two, he should consider
16   what limitations, if any, are actually posed by Plaintiff's depression, and whether those
17   limitations prevent Plaintiff from working.  See supra Section VI.A.3.  However, with
18   regard to each of the other impairments, Plaintiff's argument is meritless.

19

20   **C.     Assuming the ALJ Erred by Failing to Credit Dr. Benrazavi's Finding**
21          **Regarding Plaintiff's Right Shoulder, the Error Was Harmless.**

22          Plaintiff argues that the ALJ erred in assessing Plaintiff's RFC, by failing to credit
23   Dr. Benrazavi's finding that Plaintiff has a "diminished range of motion in the right
24   shoulder."  JS at 10-11.  Assuming the ALJ erred in failing to credit Dr. Benrazavi's
25   finding, the error was harmless because, at step four, the ALJ explicitly assumed Plaintiff
26   had postural limitations and would not be able to perform "overhead reaching."  AR at
27   33.

28

**D.    The ALJ Did Not Err in Classifying Plaintiff's Former Job as "Light."**

Plaintiff argues that, in classifying Plaintiff's former job as a sales representative in food products as "light," the ALJ erred by not "exploring the amount of time [Plaintiff] actually performed the light portion of the job," and "by not classifying plaintiff's work as a composite job."  JS at 14 (emphasis added).

### 1.    Legal Standard

At step four, "the claimant has the burden to prove that he cannot perform his prior relevant work either as actually performed or as generally performed in the national economy."  Carmickle v. Comm'r Soc. Sec. Admin., 533 F.3d 1155, 1166 (9th Cir. 2008) (citation and internal quotation marks omitted).  "Typically, when determining how plaintiff's past relevant work was actually performed, plaintiff 'is the primary source for vocational documentation . . . .'"  Jonker v. Astrue, 725 F. Supp. 2d 902, 911 (C.D. Cal. 2010) (quoting Social Security Ruling 82-62).  "But when determining how the work is generally performed, the ALJ can rely on the descriptions given by the [DOT] or a vocational expert."  Id. at 911-12 (citations omitted).  The Ninth Circuit has "never required explicit findings at step four regarding a claimant's past relevant work both as generally performed *and* as actually performed."  Pinto, 249 F.3d at 845 (emphasis in original).

### 2.    Application

The ALJ explicitly stated that he was only determining whether Plaintiff could perform his prior relevant work "as *generally* performed."  AR at 33 (emphasis added). Under Pinto, because the ALJ made explicit findings regarding Plaintiff's past relevant work as generally performed, he was not required to make explicit findings regarding the work as it was actually performed.  Thus, Plaintiff's claim that the ALJ erred in classifying Plaintiff's former work is meritless.

25

**VIII.**

**RELIEF**

**A.    Legal Standard**

"When an ALJ's denial of benefits is not supported by the record, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Hill, 698 F.3d at 1162 (citation and internal quotation marks omitted).  "We may exercise our discretion and direct an award of benefits where no useful purpose would be served by further administrative proceedings and the record has been thoroughly developed." Id. (citation and internal quotation marks omitted). "Remand for further proceedings is appropriate where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated." Id. (citations omitted); see also Reddick, 157 F.3d at 729 ("We do not remand this case for further proceedings because it is clear from the administrative record that Claimant is entitled to benefits.").

In cases where an ALJ has improperly rejected "claimant testimony or medical opinion," a court must remand to the ALJ "with instructions to calculate and award benefits" if (1) "the record has been fully developed and further administrative proceedings would serve no useful purpose"; (2) "the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion"; and (3) assuming "the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." Garrison, 759 F.3d at 1020 (citations and footnote omitted).

**B.    Analysis**

In this case, the record has not been fully developed.  As already stated, the ALJ must complete the sequential evaluation concerning mental impairment, after considering all relevant evidence in the record.

## IX.

## <u>CONCLUSION</u>

For the foregoing reasons, IT IS ORDERED that judgment be entered REVERSING the decision of the Commissioner and REMANDING this action for further proceedings consistent with this Order.  IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED:  September 26, 2014

_____
HON. KENLY KIYA KATO
United States Magistrate Judge

27